**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 1: 25-cr-00321-1 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| ANOSH AHMED, | ) | |
| | ) | |
| *Defendant.* | | |

## MEMORANDUM OPINION AND ORDER

Defendant, Anosh Ahmed ("Ahmed"), moves this Court to join his former Co-Defendant's Motion to Dismiss with Prejudice or in the Alternative, for an Evidentiary Hearing Based Upon Prosecutorial Misconduct in the Grand Jury (Dkt. 100). The Court, having taken Ahmed's Motion to Join ("Motion") under advisement, denies the Motion, [Dkt. 110], for the reasons stated herein.

## BACKGROUND

### A. Factual Background

Between March 2020 and March 2021, multiple federal laws were enacted to provide funding for reimbursements to hospitals and other health care providers, including laboratories, providing COVID testing to uninsured individuals. The Health Resources and Services Administration (HRSA), an agency of the United States Department of Health and Human Services, oversaw and administered the reimbursement of claims.

On June 12, 2025, a grand jury returned an indictment charging Defendant with submission of false claims for reimbursement for COVID testing. The indictment alleges that, between April 2021 and June 2022, Ahmed, among others, caused five Texas laboratories, and other laboratories, to prepare and submit false claims to HRSA seeking reimbursement for COVID testing. The alleged

1

false claims sought reimbursement in the amount of approximately $894,520,064 and resulted in actual payments in the amount of approximately $293,221,468. The government began investigating Ahmed's COVID testing claims in 2022. On June 28, 2022, for example, the FBI served a grand jury subpoena on Ahmed's company, Anosh, Inc., requesting "all documents related to COVID testing" and documentation of payments received for COVID testing." Ahmed is also charged in a separate case based on his alleged misconduct during his tenure as Loretto Hospital's[1] Chief Operating Officer (COO) and Chief Financial Officer (CFO) from December 2017 to March of 2021. *See United States v. Anosh Ahmed, et al.*, No. 24 CR 232 (Gettleman, J.) (the "Loretto 1" case). A grand jury returned the Loretto 1 indictment on July 11, 2024, a year before a grand jury returned an indictment in the present case.

While the government's investigation was ongoing, on or about August 23, 2023, Ahmed left Chicago and traveled to France and to Dubai, where he alleges his trip was prolonged due to familial health issues. After both indictments, and when he did not return to the United States, the government in Loretto 1 and the instant case respectively issued warrants for his arrest in July of 2024 and June of 2025. On November 30, 2025, Ahmed was arrested in Belgrade, Serbia based on the warrants and international notices issued in both cases. Ahmed remains in custody in Serbia where he is participating in extradition proceedings. He opposes his return to the United States and has not otherwise subjected himself to the jurisdiction of this Court.

## A. Relevant Procedural Background

On May 21, 2026, the United States Attorney for the Northern District of Illinois dismissed all charges against the defendants in *United States v. Rabbitt* on the eve of trial after significant misconduct tainted the grand jury proceedings. *See* 25-cr-693 (N.D. Ill., May 21, 2026)(Perry, J.). This

---

[1] Loretto Hospital is a safety-net medical facility serving the west side of Chicago.

misconduct included excusing jurors who disagreed with the government's case, improper prosecutorial communications of a substantive nature with grand jurors outside the grand jury room, and improper prosecutorial vouching by a "20-years-plus senior [Assistant U.S. Attorney] veteran." *Id.* The U.S. Attorney subsequently released a statement that the U.S. Attorney's Office was investigating the grand jury proceedings involving the *Rabbitt* prosecution team.[2]

Based on this statement, on May 26, 2026, Ahmed's counsel emailed the Government requesting confirmation as to whether it intended to investigate the indictments returned against Ahmed. (Dkt. 110. at *2.) Later that same day, Ahmed's then co-defendant, Mahmood Sami Khan ("Khan"), filed a Motion to Dismiss the Indictment. Through this filing, Ahmed learned that the same grand jury that indicted the defendants in *Rabbitt* returned the indictment in this matter, that the government had investigated the grand jury proceedings in this matter, and that the government subsequently decided to provide the grand jury transcripts to Khan and another Co-Defendant, Suhaib Ahmad Chaudhry ("Chaudhry"), following its investigation. (Dkt. 100 at *9-10.)

Khan's Motion to Dismiss, and Chaudhry's subsequent Motion to Join, identified eight different types of misconduct by the government: (1) repeated personal vouching for witnesses and the strength of the government's case; (2) treatment of the indictment as a foregone conclusion and assurances about post-indictment events; (3) inflammatory characterizations of the defendants, including name-calling and folk-wisdom metaphors; (4) disclosure of extra-record information including off-the-record negotiations with a subject's counsel; (5) familiarity and rapport-building with the grand jurors that compromised their independent role; (6) disclosure of related charging decisions, including the flight of one subject to Dubai and the prosecution of another in a related matter; (7)

---

[2] *See* Jon Seidel, *Chicago U.S. Attorney Says He's Reviewing Other Cases That Might Have Been Tainted Like The 'Broadview Six'*, Chicago Sun Times (May 22, 2026), https://chicago.suntimes.com/crime/2026/05/22/broadview-six-federal-prosecutors-misconduct-tainted-cases-reviewed.

mischaracterizations of legal principles upon which the undersigned defendants were ultimately indicted; and (8) mischaracterization of evidence specific to the undersigned defendant in a way that compromises the integrity of the evidence." (*Id.* at *14.)

In response to Khan's Motion, the Court set an evidentiary hearing for June 17, 2026. (Dkt. 116.) Prior to that hearing, however, the government filed an Emergency Motion to Dismiss the Indictment as to Khan and Chaudhry, with prejudice. The Court granted that motion on June 12, 2026. (Dkt. 121.) Despite moving for dismissal of his Co-Defendants, the government orally objected to Ahmed joining any dismissal motion because of his fugitive status, (*see* Dkt. 113), the subject of the present Motion.

**LEGAL STANDARD**

The fugitive disentitlement doctrine (or "the Doctrine") vests a court with discretion to refrain from considering a motion or application by a fugitive defendant. *See Molinaro v. New Jersey*, 396 U.S. 365, 366 (1970); *also see Degen v. United States*, 517 U.S. 820, 823 24 (1996). The Doctrine "stands for the proposition that those who flee from judicial process may not benefit from it." *United States v. Bokhari*, 757 F.3d 664, 674 n. 7 (7th Cir. 2014). The term "fugitive," for purposes of the Doctrine, has been applied both to persons who flee a jurisdiction with the intent of avoiding prosecution, as well as to persons who "while abroad[,] [learn] that they are under indictment and make no effort to return to the United States to face charges." *See id.* at 672. The Doctrine is discretionary, and courts consider whether disentitlement serves its purposes including enforceability of the court's judgment, deterrence of flight, and avoiding prejudice to the opposing party. *See Degen*, 517 U.S. at 824–28.

**DISCUSSION**

The government opposes Ahmed's Motion, arguing the Court should prohibit Ahmed from receiving the benefit of litigating challenges to the charges while avoiding risk of conviction. (Dkt 124 at *4.) In other words, the government objects to Ahmed, a U.S. citizen who has thus-far refused to

subject himself to the jurisdiction of this Court, from securing the same status in this proceeding as a defendant who has been arraigned and is eligible for the benefits—and subject to the risks—of the criminal process. (*Id.*) Ahmed, by contrast, argues that he is not a fugitive, and even if he were, the unique circumstances surrounding the pervasive misconduct that the government has acknowledged in this case—and others—counsels the Court to exercise its discretion to decline to apply the Doctrine. (Dkt. 128 at *3.) The Court addresses these arguments in turn.

### A. Ahmed's Fugitive Status

The government asserts that Ahmed is a fugitive for purposes of the Doctrine— whether or not Ahmed left the United States before he knew of the charges against him; primarily because the Doctrine applies whether the flight is actual (to avoid charges of which the person is aware) or "constructive" (where an individual is indicted while abroad and makes no effort to return). (Dkt. 124 at *6.) The government explains, while Ahmed may have initially left the U.S. for "business and other reasons" before any indictment was returned against him and that "[h]is return to the United States was delayed because of several significant family health issues," his current status as a fugitive is based on his own refusal to waive extradition. *See* (*id.* at *7.) The government argues, even if he has other reasons for remaining in Serbia, at least one of those reasons is to avoid prosecution in the United States, making him a fugitive for purposes of the Doctrine. *See* (*id.*) (citing *United States v. Bardakova*, 145 F.4th 231, 244 (2d Cir. 2025). ("[a] person may be considered a constructive flight fugitive if they have multiple reasons for remaining abroad, so long as one reason is to avoid prosecution in the United States.")). At minimum, even if he was not aware of the impending charges against him when he left (a point belied by the pre-indictment communications his attorneys had with the government), he at least became aware of the charges against him when he was arrested in Serbia. The government concludes, because Ahmed has chosen to remain in a Serbian jail and fight extradition, he should not be permitted to enjoy the benefits of this country's judicial process.

In support of his Motion, Ahmed emphasizes that the government does not dispute that Ahmed traveled abroad a year before the government returned an indictment in Loretto I and two years before the government returned an indictment in this case, or that the government never instructed Ahmed that he could not travel, therefore, he could only be considered a fugitive under a the "constructive" or "functional" fugitive theory. *See* (Dkt. 128 at \*4.) A key consideration in this analysis is a defendant's intent—namely, whether the defendant remained abroad to avoid prosecution. (*Id.*) (citing *Bardakova*, 145 F.4th at 242–43 ("[w]hether a defendant remains abroad 'in order to avoid prosecution' is a question of the defendant's intent.")). Ahmed argues, any contentions that he intended to remain abroad to avoid prosecution, fall flat, in light of several significant family health issues that prolonged his travel, and especially in light of the serious, pervasive misconduct calling into question the validity of the indictment in the first place. (Dkt. 128 at \*5-6.)

Notwithstanding the Court's agreement with Ahmed as to the severity of the government's misconduct, his arguments regarding his fugitive status still fail. While the parties dispute Ahmed's contention that familial health issues delayed his return to the United States, it is undisputed that, prior to any notice of the government's misconduct, Defendant refused to return on his own accord after becoming aware of the charges against him. To this day, in fact, Ahmed continues to fight extradition and refuses to submit to this jurisdiction. The nature of his continuous refusal to submit to this jurisdiction, evidences his intent, at least in part, to remain outside of the United States to avoid prosecution. Thus, the Court concludes, Ahmed is a "constructive" or "functional" fugitive for purposes of the fugitive disentitlement doctrine.

**B. Application of the Doctrine**

Having determined Ahmed's fugitive status, the Court now determines if it will use its discretionary power to apply the Doctrine to him. The government asserts application of the Doctrine is appropriate because Ahmed is attempting to obtain the benefit of a favorable ruling from this court

without risking the burdens that may flow from an adverse ruling.  *See* (Dkt. 124 at *9.)  Such application is particularly important here, where if the Court were to address the merits of a motion to dismiss Ahmed, or conduct an evidentiary hearing at his request, and rule against him, the Court could not enforce that ruling.  (*Id.*) The government concludes, consideration of any challenge to the charges against Ahmed is particularly problematic, as it would allow Ahmed to participate on par with a co-defendant who has appeared as required, while avoiding any potential consequences of subjecting himself to the Court's jurisdiction—up to and including serving any sentence the Court might impose following conviction.  (*Id.*)

Ahmed, by contrast, argues if the Court decides that Ahmed is a fugitive, which it has, it should still exercise its discretion and decline to apply the Doctrine.  (Dkt. 128 at *6.)  Ahmed explains, cases cited by the government recognize that abuse or prosecutorial overreaching in an indictment does give the court a reason to decline to apply the Doctrine.  (*Id.* at *7) (citing *United States v. Bescond*, 24 F.4th 759, 773 (2d Cir. 2021) ("were a court to identify any abuse or prosecutorial overreaching, it could decline to apply disentitlement and reach the merits of a defendant's motion even if the defendant could be classified as a fugitive."")).  Ahmed asserts, the extensive public record showing that misconduct tainted the grand jury—which the government ignored in its brief—warrants the Court's exercise of its discretion to decline application of the Doctrine here.  (Dkt. 128 at *8.)

Again, while acknowledging the severity of the government's misconduct, the Court still determines applying the Doctrine to Ahmed is appropriate.  Here, where the Court already determined that Ahmed refused to submit to this jurisdiction, despite being aware of the charges against him, and prior to any governmental misconduct, use of the Doctrine is appropriate.  Importantly, in order to maintain the principle of mutuality underlining the Doctrine, the Court will not allow Ahmed to seek the benefit of joining a favorable ruling applied to co-defendants, who were arraigned and actively participated in their defense, while allowing him to avoid any consequences of an unfavorable ruling.

*See In re Kashamu,* 769 F.3d 490, 493 (7th Cir. 2014) (emphasizing the principle of mutuality and noting that the defendant seeks to benefit from a favorable ruling without facing the consequences of an unfavorable one).

Additionally, the cases Ahmed relies on, that decline to apply the fugitive disentitlement doctrine, are easily distinguishable from the present circumstances. Unlike *Hijani*, Ahmed is a U.S. Citizen, the alleged misconduct occurred in the U.S., including Illinois, and he owns property within this jurisdiction. *Contra In re Hijazi*, 589 F.3d 401, 407-08 (7th Cir. 2009) (fugitive disentitlement doctrine did not apply to a Kuwaiti national's motion to dismiss an indictment because the defendant "has never been in the country, he has never set foot in Illinois, and he owns no property in the United States."). And unlike *Gutierrez*, Ahmed did not turn himself in to U.S. authorities and continues to fight extradition. *But cf. Gutierrez-Almazan v. Gonzales*, 453 F.3d 956, 957 (7th Cir. 2006) (after failing to report for immigration proceedings, defendant turned himself in upon notice of charges against him, rather than waiting to be apprehended). Here, where Ahmed is a United States citizen who has spent considerable time in the United States, including during the period of time in which he is alleged to have participated in and coordinated the fraud schemes charged in Loretto 1 and the instant case, and where Ahmed never voluntarily surrendered to authorities—here, in Serbia, or in Dubai—application of the Doctrine is appropriate.

### C. Prejudice Analysis

The Court now addresses the final consideration, prejudice, prior to determining if application of the Doctrine is appropriate. The government argues granting Ahmed's Motion will prejudice the other parties to the proceeding—primarily Ahmed's Co-Defendant who is subject to conditions of release, including the surrender of his passport, and who could be required to move forward with the prosecution while Ahmed will have the privilege of remaining beyond the Court's reach. (Dkt. 124 at *10-11.) Further, the government argues that any consideration of Ahmed's substantive motions also

8

prejudices the government, the public, and taxpayers who have a legitimate interest in seeing Ahmed subject himself to the Court for prosecution and who will not benefit from anything that reduces his incentive to appear. (*Id.* at *11.) Finally, the government emphasizes that Ahmed will not be unduly prejudiced by this Court applying the Doctrine because he is still entitled to file a motion to dismiss the indictment based on errors in the grand jury proceeding, **after** he is arraigned. (*Id.* at *10.)

Ahmed, by contrast, disputes that his Motion will prejudice his co-defendant who has made clear, multiple times, that he plans to plead and has no interest in challenging the indictment or trying this case. (Dkt. 128 at *10.) Ahmed also asserts the government is incorrect that he faces no prejudice from denial of this motion because the arrest warrant, the reason he currently resides in a Serbian jail facing extradition proceedings, relies on an indictment tainted by significant prosecutorial misconduct. (*Id.* at *11.) Finally, Ahmed emphasizes that the government has not argued that the misconduct in the grand jury differed in any capacity among the co-defendants, but instead has chosen to inequitably apply the remedy of dismissal, further evidencing prejudice to Ahmed if he is unable to join the dismissal motion. *See* (*id.*)

Again, the Court finds Ahmed's arguments unconvincing for multiple reasons. As an initial matter, Ahmed's assertion that he resides in a Serbian jail based on a tainted indictment, is unsupported, because he was arrested based on two warrants, including Loretto 1, and because he continues to fight the very extradition that would take him out of the Serbian government's custody. Second, and most importantly, while the Court agrees that the government has not argued that the misconduct in the grand jury differed in any capacity among the co-defendants, the Court also recognizes that Ahmed is not foreclosed from making such an argument after he submits to this Court's jurisdiction. Third, Ahmed's request would actually further the risk of disparate treatment between Defendants because he is seeking the benefits of a justice system he is actively refusing to be prosecuted in, while his co-defendant, who is in the jurisdiction, cannot escape the rulings of this

Court, whether beneficial or adverse. Considering all these factors and the possible prejudice against other parties, including the public, the Court will not allow Ahmed to join the Motion to Dismiss.

Accordingly, because of his fugitive status, because of his consistent refusal to submit to this jurisdiction, and because of potential prejudice against other parties in the proceeding, the Court denies Ahmed's Motion to Join.

### D. Entitlement to Discovery

Finally, in light of its determination that the fugitive disentitlement doctrine applies to Ahmed, the Court now determines if Ahmed is entitled to discovery, namely, sealed grand jury transcripts. Requests for grand jury transcripts fall within Rule 6. Fed. R. Crim. P. 6(e)(3)(E). Rule 6 does not restrict when the Court may consider a motion for disclosure of grand jury transcripts in a criminal case, and in fact, explicitly states "[t]he court may authorize disclosure— at a time, in a manner, and subject to any other conditions that it directs." *See id.* Pertinently, based on this broad discretion, the fact that the Court determined Ahmed cannot move forward with his motion to join, does not automatically foreclose the Court from utilizing its discretion to allow him access to sealed grand jury transcripts.

With that discretion, however, the Court still denies this request. The Court agrees with the government that there are numerous reasons not to provide Ahmed with sealed, sensitive discovery before he appears, including: because the Court cannot enforce a protective order against defendants who are not in its jurisdiction, because he is in the custody of a foreign government, and because the Court cannot enforce any pre-trial conditions. The Court reiterates, however, that this ruling does not foreclose his entitlement to such discovery if he chooses to submit to the Court's jurisdiction and also emphasizes that the government is not insulated from a future evidentiary hearing on misconduct, if and when Ahmed submits to this jurisdiction and files a renewed motion to dismiss. Ultimately,

however, for reasons informed by the Court's determination that the fugitive disentitlement doctrine applies, the Court denies Ahmed's request for discovery.

**CONCLUSION**

The Court denies Ahmed's Motion to Join [110], without prejudice. No relief, including access to sealed discovery, will be granted unless and until Defendant is arraigned, in-person, before this Court. If Ahmed submits to the Court's jurisdiction, he is given leave to renew his Motion to Dismiss the Indictment on prosecutorial misconduct grounds.

**IT IS SO ORDERED.**

Date: 7/16/2026

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge